UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                          Case No. 21-cr-254 (WMW/LIB)

        Plaintiff,

v.                                                 **REPORT & RECOMMENDATION**

Roberto Antwan Williams,

        Defendant.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636, and upon Defendant Roberto Antwan Williams' (hereinafter "Defendant") Motion to Sever Counts, [Docket No. 23], Motion to Suppress Evidence Derived from a Violation of His Fourth Amendment Rights (hereinafter "Motion to Suppress Evidence"), [Docket No. 26], and Motion to Suppress the Defendant's Cell Phone Contents. [Docket No. 48]. The Court held a Motions Hearing on April 19, 2022, as to Defendant's Motion to Sever Counts and his Motion to Suppress Evidence, and a Motions Hearing on July 18, 2022, as to Defendant's Motion to Suppress his Cell Phone Contents.[1]

At both Motions Hearings, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motion to Sever Counts, [Docket No. 23], Motion to Suppress Evidence, [Docket No. 26], and Motion to Suppress the Defendant's Cell Phone Contents, [Docket No. 48], were taken under advisement.

---

[1] On February 14, 2022, Defendant filed a pretrial Motion for Release of Brady Materials for Early Production of Jencks Act Materials, [Docket No. 22], Motion to Produce 404(b) Evidence, [Docket No. 24]; Motion for Disclosure of Government Trial Witnesses, [Docket No. 25]; Motion for Discovery, [Docket No. 27]; and Motion to Preserve and to Retain Tangible Evidence and Like Materials. [Docket No. 28]. On April 19, 2022, the Court subsequently held a Motions Hearing on the parties' pretrial motions. On April 27, 2022, the Court issued an Order addressing Defendant's pretrial motions for Discovery and Production of Evidence. [Docket No. 39].
.

For reasons discussed herein, the Court now recommends that Defendant's Motion to Sever Counts, [Docket No. 23], be **DENIED**; Defendant's Motion to Suppress Evidence, [Docket No. 26], be **DENIED**; and Defendant's Motion to Suppress his Cell Phone Contents, [Docket No. 48], be **DENIED**.

## I.    Background

Defendant is charged with two (2) counts of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (Indictment, [Docket No. 10]).

## II.    Defendant's Motion to Sever Counts. [Docket No. 23].

As noted above, the Indictment underlying this case charges Defendant with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Specifically, Count 1 of the Indictment charges Defendant with being a felon in possession of a firearm on July 31, 2020.  Count 2 of the Indictment charges Defendant with being a felon in possession of two (2) firearms on November 13, 2020.  Defendant moves the Court for an Order severing Count 2 from Count 1 because Count 1 involves a separate incident.  Defendant generally argues that, because Count 1 stems from allegations of an attempted robbery and Count 2 stems from allegations that Defendant had two firearms in his home, the two charges in the Indictment are "completely unrelated."  (See Def.'s Motion to Sever Counts, [Docket No. 23], at p. 1).

Federal Rule of Criminal Procedure 8(b) provides that an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a) (emphasis added). "The rule is broadly construed in favor of joinder to promote the efficient administration of justice." United States v.

Taken Alive, 513 F.3d 899, 902–03 (8th Cir.2008) (citing United States v. Little Dog, 398 F.3d 1032, 1037 (8th Cir. 2005); United States v. Rock, 282 F.3d 548, 552 (8th Cir. 2002)).

Federal Rule of Criminal Procedure 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "A motion to sever counts for trial is committed to the district court's discretion." United States v. Brown, 653 F.3d 656, 662 (8th Cir. 2011). Generally speaking, "[a] defendant is not prejudiced if there is sufficient evidence that one crime would be probative and admissible at a separate trial of the other count." United States v. Wetsch, No. 12-cr-45 (SRN/JJG), 2013 WL 1490222, at *3 (D. Minn. Apr. 10, 2013) (citing United States v. Davis, 103 F.3d 660, 676 (8th Cir. 1996)).

The defendant bears the burden of establishing prejudice warranting severance. United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1992). "If, under Rule 8, joinder is proper, then the defendant seeking severance has a 'heavy burden' in demonstrating that a joint trial will impermissibly infringe his right to a fair trial." United States v. Hopkins, No. 11-cr-230 (DWF/SER), 2011 U.S. Dist. LEXIS 127071, at *25-26 (D. Minn. Oct. 5, 2011) (citing United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996)), adopted by 2011 U.S. Dist. LEXIS 124904 (D. Minn. Oct. 26, 2011). "Joint trials play a vital role in the criminal justice system," because they achieve certain efficiencies, and because they "avoid[ ] the scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. 200, 209-10 (1987). "Only in an unusual case will the prejudice resulting from a joint trial be substantial enough to outweigh the general efficiency of joinder." United States v. Clay, 579 F.3d 919, 927 (8th Cir. 2009) (citing United States v. Al–Esawi, 560 F.3d 888, 891 (8th Cir. 2009)).

3

Defendant argues that joinder of Count 2 with Count 1 would be unduly prejudicial to Defendant.  In support of this argument, Defendant asserts that, while he may be acquitted of the charges stemming from possessing a firearm in July 2020, should "some members of the jury [believe] that it was more likely than not that Defendant" did possess said firearm, the admission of this may influence the jury's verdict with respect to whether Defendant possessed two firearms in November 2020.  (See Def.'s Motion to Sever Counts, [Docket No. 23], at pp. 4-5).

Defendant's motion, as submitted on the present record, is insufficient to sustain his heavy burden to demonstrate that severance is warranted.  First, Count 1 and Count 2 involve offenses that are the same or similar in character.  "'[W]here the offenses are similar in character and occurred over a relatively short period of time and the evidence overlaps, joinder is ordinarily appropriate.'"  United States v. Tyndall, 263 F.3d 848, 849 (8th Cir. 2001) (quoting United States v. McClintic, 570 F.2d 685, 689 (8th Cir. 1978)).  Count 1 of the Indictment charges Defendant with being a felon in possession of a firearm on July 31, 2020.  Count 2 of the Indictment charge Defendant with being a felon in possession of two (2) firearms on November 13, 2020.  The offenses involve similar conduct, they clearly refer to the same type of offense: being a felon in possession of firearms.  See Garrett, 648 F.3d at 625.

Second, the incidents giving rise to the Counts in the present Indictment also happened over a relatively short period of time. The incident giving rise to Count 1 allegedly occurred on July 31, 2020, and the incident giving rise to Count 2 allegedly occurred on November 13, 2020, providing less than four months between the incidents.  Indeed, joinder has been found to be proper when the similar offenses are as far apart in time as two years.  Garrett, 648 F.3d at 625 (finding offenses 15 months apart properly joined); United States v. Lindsey, 782 F.2d 116, 117 (8th Cir. 1986) (per curiam) (providing offenses 17 months apart were properly joined); United States v.

4

Rodgers, 732 F.2d 625, 629 (8th Cir. 1984) (holding joinder proper when offenses were 20 months apart); United States v. Hastings, 577 F.2d 38, 40 (8th Cir. 1978) (finding offenses two years apart properly joined); United States v. Pearson, No. 15-cr-117 (JRT/TNL), 2015 WL 6445439, at *15 (D. Minn. Oct. 23, 2015) (finding offenses occurring over an approximately three-year period to be properly joined). The incidents in the present case occurred only slightly more than three months apart in time, and therefore, do not violate the joinder requirement that the offenses occur "over a relatively short period of time[.]" Garrett, 648 F.3d at 625.

Moreover, Defendant fails to articulate or demonstrate any specific prejudice attributable to a joint trial. He contends only in conclusory terms that the admission of evidence that Defendant possessed a firearm in July 2020, may influence the jury's verdict with respect to whether Defendant possessed two firearms in November 2020. While Defendant asserts that the jury would not be able to give fair consideration to the alleged incidents separately, Defendant does not explain why careful jury instructions could not eliminate this speculative issue. With proper limiting instructions, the jury will be able to apply the evidence separately and to differentiate each charge. See United States v. Wadena, 152 F.3d 831 (8th Cir. 1998).

As articulated above, there is a strong preference in the federal system for joint trials on properly joined counts. In light of that preference, and at this juncture where Defendant can only invite the Court to speculate as to what evidence the Government might actually seek to introduce at trial, severance is not at this time appropriate. "Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances." United States v. Billups, 442 F. Supp. 2d 697, 706 (D. Minn. 2006).

For all of the reasons articulated above, the undersigned recommends that Defendant's Motion to Sever Counts, [Docket No. 23], be **DENIED without prejudice**.

III.    **Defendant's Motion to Suppress Evidence.  [Docket No. 26].**

Defendant moves this Court for an Order suppressing all evidence obtained as a result of the search of a silver sports utility vehicle (the "SUV").  (Def.'s Motion to Suppress Evidence, [Docket No. 23]).  In support of this request, Defendant argues that law enforcement officers lacked reasonable articulable suspicion to initially stop the SUV in which Defendant was a passenger.[2]

A.  **Relevant Facts**[3]

The record presently before the Court indicates that, on July 31, 2020, at approximately 12:30 a.m., St. Cloud Police Officer Benjamin Eckberg ("Officer Eckberg") was dispatched to 1245 St. Germaine Street East in St. Cloud, Minnesota, to respond to a complainant who reported being the victim of a "potential assault" in which a firearm may been involved.  (Tr. 17).[4]  Due to the "high profile or high priority" report, St. Cloud Police Sergeant Roger Baumann ("Sergeant Baumann") also drove towards the scene.  (Tr. 34).

Approximately five minutes later, Officer Eckberg arrived at the parking lot of a Wendy's fast-food restaurant located on the northeast corner of Highway 10 and St. Germaine Street East. (Tr. 18).  Officer Eckberg found the complainant, later identified as Ousman Bah.  (Tr. 18-19). Officer Eckberg testified that Mr. Bah appeared "still very worked up from what had happened" because his "voice inflection was high," his speech was fast, he was "moving around," and his

---

[2] Defendant initially challenged, among other things, the legality of his arrest and the subsequent search of his person in his written Motion.  (Def.'s Mot. to Suppress Evidence, [Docket No. 26]).  However, in his memorandum of support of the present Motion, Defendant does not now directly challenge his arrest and search.  (Def.'s Mem., [Docket No. 42], at p. 1 ("The singular issue is whether or not the traffic stop preceding his arrest and subsequent discovery of a firearm in a vehicle where he was a passenger violated the Fourth Amendment.").  Therefore, Defendant has essentially waived any argument regarding the legality of his arrest and the subsequent search of his person.

[3] The facts contained in this section are derived from the Government's exhibit presented in this case, the testimony of Police Officer Benjamin Eckbert, and the testimony of Sergeant Roger Baumann.

[4] Throughout this Report and Recommendation, the Court refers to the transcript of the April 19, 2022, Motions Hearing by the abbreviation "Tr." (Transcript, [Docket No. 40]).

gestures were quick.  (Tr. 19).  Officer Eckberg testified that Mr. Bah had "a thick accent," and despite attempts to have Mr. Bah slow down his speech, Mr. Bah continued speaking "very quickly." (Tr. 19).  Officer Eckberg eventually understood that "someone had grabbed [Mr. Bah] . . . in some sort of altercation, and [Mr. Bah] had seen a handgun." (Tr. 19).   Mr. Bah then "pointed to a silver [sports utility] vehicle . . . stopped at a red light," approximately only 100 feet away, and told Officer Eckberg that the vehicle had been "at the scene during the crime." (Tr. 19-20).

Officer Eckberg then observed a marked patrol vehicle stopped at a red light, facing eastbound at Highway 10.  (Tr. 20, 35).  After determining that Sergeant Baumann was the occupant of the patrol vehicle, Officer Eckberg radioed for Sergeant Baumann to stop the SUV facing westbound at Highway 10, because "it was leaving the area where the crime had occurred[,]" . . . and the victim stat[ed] that there [were] either witnesses or involved parties inside of the vehicle." (Tr. 20-21).  Officer Eckberg testified at the April 19, 2022, Motions hearing that, while he did not observe the SUV commit any traffic violations, his basis for having the SUV stopped was to question the occupants as potential witnesses or to determine their involvement to Mr. Bah's assault, (Tr. 27), based on the contemporaneous identification of the vehicle by Mr. Bah.

Sergeant Baumann immediately turned his patrol vehicle around and activated his emergency lights to initiate a traffic stop of the SUV.  (Tr. 36; Gov't's Ex. 1, at 00:55-01:07).[5] The SUV pulled to the right and stopped. (Gov't's Ex.1, at 01:08-01:20).  Sergeant Baumann

---

[5] Government's Exhibit 1 is Sergeant Baumann's dashboard camera video. At the Motions Hearing, the Government, without objection, offered the video into evidence as Government's Exhibit 1. (Tr. 15).  The citations to the body camera footage are in a MM:SS (minutes:seconds) format.

testified that he only initiated the stop because Officer Eckberg had informed him that there were potential witnesses to a reported assault inside of the SUV. (Tr. 36).

Sergeant Baumann approached the driver's side window of the SUV wherein he observed two occupants—a female, later identified as Bianca Ellison, in the driver's seat, and Defendant in the front passenger seat. (Tr. 37; Gov't Ex. 1, at 01:21-01:49). Sergeant Baumann greeted them and asked for license and insurance information. (Gov't Ex. 1, at 01:50-01:51). Ms. Ellison asked Sergeant Bauman, "What did I do?" to which Sergeant Bauman responded, "I'll let you know in a second." (Id. at 01:52-02:16). Sergeant Baumann observed Defendant with "his hands up in the air and his hands were shaking." (Tr. 37). Sergeant Bauman then asked Defendant for his identification and inquired where they were coming from, to which Ms. Ellison responded that they had come from the Speedway Gas Station. (Tr. 38; Gov't Ex. 1, at 02:17-03:08). Sergeant Baumann testified that this response was suspect because he had seen the SUV drive past the Speedway Gas Station earlier. (Tr. 38). Sergeant Baumann also testified that he smelled a strong odor of marijuana emanating from the inside of the SUV. (Tr. 39).

In the meantime, Officer Eckberg continued to speak with Mr. Bah in the Wendy's parking lot in order to "gather the facts of the incident." (Tr. 21). Mr. Bah did provide Officer Eckberg with a description of the individual who had assaulted him as a black male with dreadlocks wearing a white t-shirt and pajama pants. (Tr. 21). Officer Eckberg radioed the suspect's description to Sergeant Baumann. (Tr. 21, 39). Sergeant Baumann testified that he then noticed that Defendant matched the description of the suspect because he was a "black male, had some shorter dreads, was wearing a white T-shirt and what looked like pajama pants on." (Tr. 40). Sergeant Baumann then radioed for additional police officers to come to scene to assist him. (Tr. 40). Shortly thereafter, St. Cloud Police Officer Dwayne Bergsnev ("Officer Bergsnev") arrived on the scene.

(Tr. 41; Gov't's Ex. 1, at 07:03-07:06).   Sergeant Baumann then directed Officer Bergsnev to detain Defendant.  (Tr. 42).

Officer Bergsnev asked Defendant to step out of the vehicle while Sergeant Baumann continued speaking with Ms. Ellison, who was still seated in the driver's seat.  (Tr. 42; Gov't's Ex. 1, at 07:40-08:23).   Sergeant Baumann asked Ms. Ellison once more where they were coming from, to which Ms. Ellison repeated that they were coming from the Speedway Gas Station. (Gov't's Ex. 1, at 08:10-08:13). Sergeant Baumann then stated, "You were on the other side of Highway 10 when I saw you pass me.  Where were you at before that?"  (Id. at 08:14-08:29).  Ms. Ellison repeated that they had come from the gas station.  (Id. at 08:29-08:33).  Sergeant Baumann asked Ms. Ellison if there were any weapons inside of the SUV, to which she responded that she did not have any; however, she eventually stated that she was not aware of any weapons inside of the SUV.  (Tr. 42-43; Gov't's Ex. 1, at 08:34-08:59).

Once Defendant was escorted to the patrol vehicle, Sergeant Baumann asked Ms. Ellison to step out of the SUV.  (Tr. 42-43; Gov't's Ex. 1, at 09:00-09:45).  Sergeant Baumann then observed "a small clearer plastic baggie . . . on the driver's side floorboard," which he believed, based on his training and experience, was narcotics.  (Tr. 43-44).  Ms. Ellison was then escorted to Sergeant Baumann's patrol vehicle and placed in the rear seat.  (Tr. 44).

Sergeant Baumann testified that, in the meantime, Officer Bergsnev was having difficulty placing Defendant in the rear seat of his patrol vehicle.  (Tr. 44; Gov't's Ex. 1, at 09:46-21:13). Sergeant Baumann and Officer Bergsnev can be heard repeatedly directing Defendant to sit in the rear of Bergsnev's patrol vehicle, assuring him that there was dashboard camera recording the interaction; that the windows of the patrol vehicle could be rolled down for him; that they were investigating a crime involving a firearm; that Defendant matched the description of the suspect;

and that Defendant may be arrested for passively resisting and refusing to enter the rear of the patrol vehicle. (Gov't's Ex. 1, at 09:46-25:29). Eventually, Defendant was sat on the ground outside of the passenger side rear door of another patrol vehicle. (Tr. 44).

Officer Eckberg arrived on the scene with Mr. Bah in order to conduct a "show up" identification. (Tr. 22, 45). Mr. Bah identified Defendant as the individual who had assaulted him. (Tr. 22, 45). After conferring with Officer Eckberg as to the details of the assault, Sergeant Baumann placed Defendant under arrest. (Tr. 45). Defendant was placed in the rear of a patrol vehicle. (Tr. 46).

Officer Eckberg testified that certain areas of the SUV were then searched by the officers at the scene, and a "black Smith & Wesson 9-millimeter handgun" was located inside of the passenger glove box. (Gov't's Ex. 1, at 30:08-35:27; Tr. 22-23, 29).

### B. Standard of Review

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. A traffic stop constitutes a seizure under the Fourth Amendment. United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 1994). It is well-established that law enforcement officers may make an investigatory stop of a vehicle if they have a reasonable and articulable suspicion of criminal activity. See, e.g., United States v. Tamayo-Baez, 820 F.3d 308, 312 (8th Cir. 2016); United States v. Hightower, 716 F.3d 1117, 1119 (8th Cir. 2013); United States v. Bustos-Torres, 396 F.3d 935, 942 (8th Cir. 2005).

"Reasonable suspicion exists when an 'officer is aware of particularized, objective facts which, taken together with rational inferences from the facts, reasonably warrant suspicion that a crime has been committed.'" Tamayo-Baez, 820 F.3d at 312 (quoting United States v. Givens,

763 F.3d 987, 989 (8th Cir. 2014)); United States v. Hughes, 517 F.3d 1013, 1016 (8th Cir. 2008). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7 (1989) (internal quotations marks omitted). "While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." Tamayo-Baez, 820 F.3d at 312. "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence and obviously less than is necessary for probable cause." Navarette v. California, 134 S. Ct. 1683, 1687 (2014).

The inquiry into whether reasonable suspicion exists considers whether "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate." Terry, 392 U.S. at 21-22. It is an objective standard based on the information known to the officers at the time of the seizure. United States v. Hamilton, 591 F.3d 1017, 1022 (8th Cir. 2010). A reviewing court utilizes a totality of the circumstances analysis to determine whether reasonable suspicion exists. Hughes, 517 F.3d at 1016.

### C. Analysis

Defendant challenges only the initial stop of the SUV. Therefore, the only question before the Court is whether, under the totality of the circumstances presented here, Sergeant Baumann was justified in conducting, or stated another way, had reasonable articulable basis to make an investigative stop of the SUV.

Defendant argues that, because St. Cloud police officers were not justified in stopping the SUV "solely to get information," all evidence obtained as a result of the search of the SUV should

be suppressed.  (Def.'s Mem., [Docket No. 42], at pp. 4-7).[6]  The Court finds this argument unpersuasive.

While it is well established that, under Terry v. Ohio, 392 U.S. 1 (1968), an investigative stop of a vehicle "does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity," there is no requirement that there must first be a traffic violation.  See United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999); Alabama v. White, 496 U.S. 325 (1990) (upholding stop of vehicle in absence of traffic violation).  Further, "[i]n deciding whether to conduct a Terry stop, an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation." United States v. Thomas, 249 F.3d 725, 728 (8th Cir. 2001).  As noted above, the inquiry into whether reasonable suspicion exists considers whether "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate," which is an objective standard based on the information known to the officers at the time of the seizure.  Terry, 392 U.S. at 21-22; Hamilton, 591 F.3d at 1022.

Here, at the time Officer Eckberg asked Sergeant Baumann to conduct an investigative stop of the SUV, Officer Eckberg was aware that, according to Mr. Bah, the SUV he pointed out had been present during Mr. Bah's assault only a few moments earlier.  Specifically, at the April 19, 2022, Motions hearing, Officer Eckberg testified that, while it was difficult to understand Mr. Bah, what he could discern was that the occupants of the SUV were potential witnesses.  Officer Eckberg considered it important to stop the SUV, which was moving away from the scene of crime, in order to "control the scene" and to further investigate the nature of the occupants' actual

---

[6] Defendant essentially raises a "fruit of the poisonous tree" argument asserting that the search of the SUV should be suppressed because it flowed from the purported unlawful initial stop of the SUV.  In other words, but-for the unconstitutional investigative stop of the SUV, St. Cloud police officers would not have identified Defendant as a suspect in Mr. Bah's assault, and they then would not have found a firearm in the SUV's passenger glove box.

involvement in Mr. Bah's assault. (Tr. 27). Both Officer Eckberg and Sergeant Baumann agreed at the Motions hearing that no traffic violation had occurred and that the occupants of the SUV (Defendant and Ms. Ellison) were stopped as "either witnesses or involved parties" to Mr. Bah's assault.

The record before the Court indicates that Officer Eckberg had a reasonable, articulable basis to ask Sergeant Baumann to initiate an investigative stop of the SUV. Officer Eckberg understood from Mr. Bah that the occupants of the SUV were potential witnesses to his assault, it was reasonable for Officer Eckberg to believe that the occupants of the SUV may have had pertinent information about Mr. Bah's assault considering: 1) the difficulty in understanding Mr. Bah due to, among other things, his excitement and thick accent; 2) that Mr. Bah had reported being assaulted with a firearm only a few minutes earlier; 3) that Mr. Bah had pointed out the SUV from the very scene of the crime within mere minutes of his assault; 4) that the SUV was driving away from the scene of the crime; and 5) that there was an extremely short period of time between arriving to assist Mr. Bah, trying to understand him, determining that the SUV had witnesses or some involvement in his assault, and radioing for Sergeant Baumann to initiate an investigative stop of the SUV. This Court is required to give law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997) (citations omitted); see also United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) ("[O]fficers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"). If the SUV had not been stopped, Officer Eckberg would have lost the chance to more fully and completely conduct his investigation.

Therefore, considering the totality of the circumstances that were known to Officer Eckberg just prior to the investigative stop of the SUV in which Defendant was a passenger, this Court finds that Officer Eckberg was justified in asking Sergeant Baumann to an initiate an investigative stop of the SUV.  See United States v. Juvenile TK, 134 F.3d 899, 904 (8th Cir.1998) (finding reasonable suspicion of criminal activity that justified the investigative stop of a vehicle based on the vehicle's temporal and geographic proximity to the crime scenes; the vehicle—identified generically as "a gray car"—was spotted no more than two blocks away from the scene of the robbery and within five minutes of the second dispatch).

Moreover, temporarily detaining potential witnesses of a crime is not per se unreasonable. The officers could stop the SUV to obtain information from Defendant and Ms. Ellison as potential witnesses to a crime so long as the officers satisfied the reasonableness requirement of the Fourth Amendment. The U.S. Supreme Court has upheld brief, suspicionless seizures in limited circumstances.  See Illinois v. Lidster, 540 U.S. 419, 424 (2004) ("[S]pecial law enforcement concerns will sometimes justify highway stops without individualized suspicion.").  In those circumstances, the constitutionality of the stop turns on reasonableness—not individualized suspicion.  In determining whether the stop was reasonable, the Court looks to "'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" Lidster, 540 U.S. at 427 (quoting Brown v. Texas, 443 U.S. 47, 51 (1979)).

Applying these factors, the Court finds Officer Eckberg and Sergeant Baumann's conduct were reasonable under the circumstances here.  First, the public concern was grave given that Officer Eckberg was investigating an assault with a firearm.  Second, Officer Eckberg had reason to believe that the SUV in which Defendant was a passenger had specific information about Mr.

Bah's assault, therefore, Ms. Ellison and Defendant's limited, investigatory seizure advanced the public interest in finding out information relating to said assault. Third, the investigative detention interfered only minimally with Defendant's liberty because his detention was only for approximately three minutes before Defendant was found to match the description of Mr. Bah's assailant.

Therefore, for the reasons set forth above, this Court finds no Fourth Amendment violation in the initial, investigatory stop of the SUV in which Defendant was a passenger. Accordingly, to the extent Defendant's Motion to Suppress Evidence, [Docket No. 55], seeks an Order of this Court suppressing all evidence flowing from the July 31, 2020, investigatory stop of the SUV in which Defendant was a passenger on the assertion that said stop was at its inception constitutionally impermissible, the undersigned recommends that Defendant's Motion to Suppress Evidence, [Docket No. 26], be **DENIED**.

## IV. Defendant's Motion to Suppress His Cell Phone Contents. [Docket No. 48].

Defendant moves this Court for an Order suppressing all evidence flowing from the execution of a warrant issued on November 16, 2020, which authorized law enforcement to search the contents of his cellular phone. (Def.'s Motion to Suppress Defendant's Cell Phone Contents, [Docket No. 48]). In support of this request, Defendant argues that the November 16, 2020, Search Warrant "was overly broad and violated the particularity requirement" because "it contained no limits to its search and encompass[ed] all data contained in the cell phone." (Id. at pp. 3-6).

### A. Relevant Facts[7]

On November 16, 2020, Police Officer Ryan Ebert of the St. Cloud Police Department ("Investigator Ebert") and assigned to the Criminal Investigation Unit, applied for a warrant to

---

[7] The facts contained in this section are derived from Defendant's exhibits presented in this case and the testimony of St. Cloud Police Officer Ryan Ebert.

search an LG smartphone belonging to Defendant.[8]  (See Search Warrant Application, Def.'s Ex. A, at p. 1).[9]  The affidavit that Investigator Ebert drafted and submitted in support of the warrant application set forth the following:

On November 13, 2020, Investigator Ebert received a report from St. Cloud Hospital personnel that a five-year old had been brought in by his mother, Bianca Ellison, with a gunshot wound to his head.  (Id.).  The five-year old was pronounced dead at the hospital.  (Id.).  St. Cloud Police officers ultimately interviewed Ms. Ellison and Defendant, who reported leaving their home (the "Residence") to go to the store when Ms. Ellison received a phone call asking for her to come back to the Residence because her son, D.P., had a "bloody nose."  (Id. at p. 2).  After Ms. Ellison and Defendant returned to the Residence and found D.P. in her bedroom with a "busted-up face," they transported D.P. to the emergency room.  (Id.).  Ms. Ellison reportedly denied any knowledge of firearms in the Residence and stated that D.P. was "known for getting into things."  (See Search Warrant Application, Def.'s Ex. A, at p. 1).  Ms. Ellison's vehicle was towed from the St. Cloud Hospital to the St. Cloud Police Department and secured in the Forensics Bay, and Defendant's LG smartphone was taken as evidence and secured at the St. Cloud Police Department.  (Id. at p. 2).

Investigator Ebert further provided that St. Cloud Police officers conducted an emergency sweep of the Residence.  (Id.).  St. Cloud Police officers also reviewed video from a neighbor's motion activated camera, which captured, among other things, Defendant leaving the Residence with a black backpack and placing it into a blue garbage bin near the Residence's alleyway.  (Id.).

---

[8] Investigator Ebert also provided that he was investigating a homicide, which had occurred in St. Cloud, Minnesota, and was documented under St. Cloud Police Department case number 20047859.

[9] Defendant's Exhibit A is the search warrant application and supporting affidavit to search Defendant's LG smartphone.  At the July 18, 2022, Motions Hearing, Defendant, without objection, offered the warrant application and supporting affidavit into evidence as Defendant's Exhibit A.  (July 18, 2022, Motions Hearing Tr. 8).

Investigator Ebert also provided that Ms. Ellison's daughter, K.G., was interviewed by St. Cloud Police investigators wherein she reported being in the Residence when the shooting happened; contacting Ms. Ellison and Defendant and asking them to come back to the Residence; finding a purple and black firearm next to D.P. in the bedroom; giving the firearm to Defendant; and observing Defendant leave the residence with the firearm. (Id. at p. 3).

Investigator Ebert provided that a search warrant was then executed at the Residence wherein "a purple and black 9mm handgun," among other things, was found in a garbage bin outside of the Residence, which matched the description provided by K.G., and matched the location where Defendant was captured on video placing the black backpack. (See Search Warrant Application, Def.'s Ex. A, at p. 3). Investigator Ebert also learned that suspected cocaine, ecstasy, and K2 were located both inside of the Residence and inside of the black backpack. (Id.).

Investigator Ebert provided that the firearm seized was "a Taurus G2c with serial number ABH754337," which had been stolen on October 29, 2020; and that Defendant was charged with armed robbery of an adult male on July 31, 2020, after he was reportedly stopped in a vehicle with a "9 mm handgun and baggies containing heroin, cocaine, and ecstasy." (Id.). Investigator Ebert provided that, among other things, based on his experience and training he was aware that people who use or sell drugs "also tend to use cellphones to facilitate the transactions and that they also use phones to photo, video, and message about the guns and drugs," which can occur, "over a variety of different platforms or apps within the phone, such as Facebook, Facebook Messenger, Snapchat, etc, as well as through traditional text messaging options." (Id.). Investigator Ebert requested a search warrant to search "the phone belonging to [Defendant] to locate evidence of him gaining possession of the gun and the possession of the drugs located with the firearm." (Id.).

The affidavit further described the property and things to be searched for in the "LG smartphone in a black leather case" as: "Any and all information stored within the cellular phone," which included, among other things, the assigned telephone number, stored contact information such as names, numbers, and email addresses, incoming/outgoing calls and text messages, photographs and videos." (See Search Warrant Application, Def.'s Ex. A, at p. 1).

On that same day, November 16, 2020, based on the information provided by Investigator Ebert, the Honorable Shan Wang, Stearns County District Court Judge, State of Minnesota, concluded that there was probable cause to believe that evidence of a crime would be found in the LG smartphone, and she issued a warrant to search its contents (the "Cellphone Search Warrant"). (See Search Warrant, Def.'s Ex. B).[10]  Specifically, the Cellphone Search Warrant identified the device to be searched as an "LG smartphone in a black leather case" and the property and things to be searched for and seized as:

> Any and all information stored within the cellular phone, including but not limited to assigned telephone number, stored contact information such as names, numbers, and email addresses, incoming/outgoing calls and text messages, photographs and videos, Internet and browsing history, and all information as it relates to social media communication and any data included within stored applications.  Internally stored data devices, including but not limited to SIM card(s) between 10-22-20 and 11-16-20.

(Id. at p. 1).  Thereafter, St. Cloud Police Investigator Christopher Voth utilized software to download the contents from Defendant's LG smartphone, and Investigator Ebert executed the Cellphone Search Warrant by reviewing the extracted information.  (Tr. 28-29).

**B.  Standard of Review**

---

[10] Defendant's Exhibit B is the warrant to search Defendant's LG smartphone.  At the July 18, 2022, Motions Hearing, Defendant, without objection, offered the warrant application and supporting affidavit into evidence as Defendant's Exhibit B.  (July 18, 2022, Motions Hearing Tr. 8).

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and <u>particularly describing</u> the place to be searched, and <u>the persons or things to be seized</u>." U.S. Const. amend. IV (emphasis added). To satisfy the particularity requirement, the place to be search must be "described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort" and to avoid mistakenly searching the wrong premises or seizing the wrong items. <u>United States v. Gitcho</u>, 601 F.2d 369, 371 (8th Cir. 1979); <u>United States v. Thomas</u>, 263 F.3d 805, 808 (8th Cir. 2001); <u>United States v. Gleich</u>, 397 F.3d 608, 611 (8th Cir. 2005). "[T]he warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." <u>United States v. Sigillito</u>, 759 F.3d 913, 923 (8th Cir. 2014) "[T]he degree of specificity required will depend on the circumstances of the case and on the type of items involved. This particularity standard is one of 'practical accuracy rather than' of hypertechnicality." <u>Id.</u>; <u>see</u> <u>Groh v. Ramirez</u>, 540 U.S. 551, 557 (2004); <u>United States v. Fitzgerald</u>, 724 F.2d 633, 637 (8th Cir. 1983).

## C. Analysis

Defendant does not refute that the application and affidavit submitted in support of the Cell Phone Search Warrant provided a sufficient basis upon which Judge Wang could conclude that probable cause existed to support the issuance of said warrant. Rather, Defendant raises a particularity challenge to the issued warrant itself, arguing that the Cellphone Search Warrant authorized only "a general exploratory search of all data on the phone without specifying or limiting the search to evidence of a crime." (Def.'s Brief, [Docket No. 56], pp. 3-6).

Defendant analogizes the current case to United States v. Jackson, 18-cr-211 (JNE/ECW), 2019 WL 13127190 (D. Minn. Jan. 4, 2019).  (Def.'s Brief, [Docket No. 56], at p. 5).[11]  In Jackson, law enforcement arrested the defendant pursuant to a felony warrant, seizing a cellular phone from his pants. 2019 WL 13127190, at *2, report and recommendation adopted, No. 18-CR-211 (JNE/ECW), 2019 WL 13127184 (D. Minn. Feb. 26, 2019).  An officer later applied for a warrant to search the defendant's cellular phone for:

> Any and all files including but not limited to records, notes, names, telephone numbers, photographs, videos, text messages, call log information regarding specific communication to and from the telephone that are electronically stored in the telephone.

Id. at *3. A Hennepin County judge signed the search warrant, and the search of the cell phone was thereafter executed. Id. at *4-5.  The defendant in Jackson moved to suppress the evidence obtained from his cellular phone for multiple reasons, including that the search warrant was overbroad.  Id. at *8-9.  The defendant in Jackson argued that "the cell phone warrant was overly broad and violated the particularity requirement because 'it contain[ed] no limits to its search' and encompass[ed] 'all data contained in the cell phone.'"  Id. at *9.  The Honorable Elizabeth Cowan-Wright agreed, finding that the warrant to search the defendant's cellular phone was overbroad because it did not limit the files on the cellular phone that were to be searched and seized, but authorized the seizure of "any and all" files and records electronically stored on the phone. Jackson, 2019 WL 13127190, at *10.  Specifically, Judge Cowan-Wright found that the cell phone warrant at issue in Jackson contained "no constraints on the files to be searched for or seized, and this constitute[ed] an impermissible 'blanket search of documents for no particular purpose.'"  Id.

---

[11] Defendant provided the warrant application, supporting affidavit, and the search warrant at issue in United States v. Jackson, 18-cr-211 (JNE/ECW), 2019 WL 13127190 (D. Minn. Jan. 4, 2019).  At the July 18, 2022, Motions Hearing, Defendant, without objection, offered the warrant application, supporting affidavit, and search warrant into evidence as Defendant's Exhibit C and D.  (July 18, 2022, Motions Hearing Tr. 8).

Here, Defendant urges this Court to adopt Judge Cowan-Wright's reasoning in <u>Jackson</u>. (Def.'s Brief, [Docket No. 56], p. 5). As in <u>Jackson</u>, Defendant asserts that the Cellphone Search Warrant's boilerplate "Any and all" phrase was insufficiently particular, overbroad, and was tantamount to "rummag[ing] through a person's home." (<u>Id.</u> at p. 4-5). In response, the Government concedes that the search warrant at issue in this case contained on its face the same "Any and all" phrase at issue in <u>Jackson</u>; however, it argues that, unlike <u>Jackson</u>, the Cell Phone Search Warrant here was sufficiently particular in that the files to be searched for or seized were limited by a three week timeframe—from October 22, 2020 to November 16, 2020—which were dates reasonably related to the offenses outlined in the warrant's affidavit. (Govt.'s Response, [Docket No. 58], pp. 5-10).

The record now before the Court indicates that, while the Cellphone Search Warrant here authorized the search of Defendant's LG smartphone for "[i]nternally stored data devices . . . between 10-22-20 and 11-16-20," as in <u>Jackson</u>, the items or files to be searched and seized were otherwise not limited to information related to felony gun and drug possessions such that it would have allowed for law enforcement searching the contents of the LG smartphone to avoid searching and seizing the wrong information. <u>See</u> 18 USC §§ 922(g)(1), 924(a)(2); <u>see e.g.</u>, <u>United States v. Gleich</u>, 397 F.3d 608, 612 (8th Cir. 2005); <u>United States v. Nieman</u>, 520 F.3d 834, 839 (8th Cir. 2008); <u>United States v. Sherman</u>, 372 F. App'x 668, 676 (8th Cir. 2010); <u>see also</u> <u>Jackson</u>, 2019 WL 13127190, at *10.

Therefore, the Court finds that the Cellphone Search Warrant itself authorizing the search of Defendant's LG smartphone was insufficiently particular and unconstitutionally overbroad as to the information subject to seizure.

This does not end the Court's analysis, however. The Government argues, alternatively, that even if the Cellphone Search Warrant is found to be invalid, Investigator Ebert relied on it in good faith, and therefore, the evidence should not be suppressed under the Leon good faith exception. (Gov't Mem., [Docket No. 67], at pp. 7-10). The Court agrees.

In United States v. Leon, the Supreme Court of the United States espoused a good faith exception to the exclusionary rule in a Fourth Amendment case. United States v. Leon, 468 U.S. 897 (1984). "Reasoning that the exclusionary rule was a judicial remedy created to guard individual rights through its deterrent effect against police misconduct, the court held that evidence should not be suppressed where police officers rely in reasonable good faith on a properly obtained warrant, that proves to be invalid." Thomas, 263 F.3d at 808 (citing United States v. Leon, 468 U.S. 897, 906 (1984)). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

United States v. Marion, 238 F.3d 965, 969 (2001).

The Eighth Circuit Court of Appeals has extended the Leon good faith exception to search warrants that are insufficiently particular or overbroad. See, e.g., Jackson, 2019 WL 13127190, at *12; United States v. Harris, No. 20-cr-98 (SRN/TNL), 2021 WL 3929270, *4 (D. Minn. Sept. 2, 2021) (assuming without deciding that the Facebook search warrant was overly broad, concluding that the good-faith exception applied, and citing cases); United States v. Henderson, 416 F.3d 686, 695 (8th Cir. 2005) (affirming finding that good-faith exception applied to overly broad warrant); United States v. Curry, 911 F.2d 72, 78 (8th Cir. 1990). Relevant factors include, among other

things, whether the warrant was issued by an unbiased judge, whether the officer who requested the warrant was the same officer who executed the warrant, whether there was probable cause for the search, whether the sworn application was attached to the warrant, and whether, in the context of the warrant, the officer had a reasonable belief the warrant was limited to the seizure of more particular items.  See, e.g., Henderson, 416 F.3d at 695; Curry, 911 F.2d at 78; United States v. Bryant, No. 19-CR-29 (ADM/ECW), 2019 WL 3307393, at *8 (D. Minn. June 7, 2019), report and recommendation adopted, No. CR 19-29 ADM/ECW, 2019 WL 3308220 (D. Minn. July 23, 2019).

    Here, Defendant does not contend that Judge Wang wholly abandoned her judicial role in issuing the Cellphone Search Warrant.  Nor does Defendant assert that said warrant was not supported by probable cause.  Rather, Defendant first asserts that the good-faith exception to the warrant requirement does not apply because, despite "knowing fully well" that he was not investigating a homicide at the time he drafted his application for the Cellphone Search Warrant, Investigator Ebert nevertheless indicated that he was.  (See Search Warrant Application, Def.'s Ex. A, at p. 1).  However, the Court finds this argument unpersuasive.  At the July 26, 2022, Motions hearing, Investigator Ebert testified that he indicated he was investigating a homicide in his application for the Cellphone Search Warrant because, while he had a "general trajectory given to [him] by the [emergency room] staff," it was still unknown how D.P. had died at that point without a final autopsy report—it could have been a potential homicide or a potential accident. (Tr. 25).  Thus, Investigator Ebert's statement that he was "investigating a homicide" was not a false or reckless misstatement.  Moreover, the Court cannot conclude that the affidavit contained a "false statement made knowingly and intentionally or with reckless disregard for its truth," without first conducting a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), and here

no such hearing was timely sought or conducted.  See United States v. Maxwell, 778 F.3d 719, 731-32 (8th Cir. 2015) (requiring that determinations regarding whether an affidavit contains recklessly false statements be made only after a Franks evidentiary hearing).

Defendant next argues that the good-faith exception should not apply because the Cell Phone Search Warrant was so facially deficient in authorizing the search of "the entire contents" of the LG smartphone that Investigator Ebert could not have reasonably presumed the Cellphone Search Warrant was valid.  The Court also finds this argument unpersuasive.  Investigator Ebert not only drafted both the application and the affidavit, but he was also the officer that executed the warrant, and he personally reviewed the material downloaded from the Cellbrate software.  (Tr. 28-29).  As the Eighth Circuit stated in Curry, "[t]his fact is significant because in assessing whether reliance on a search warrant was objectively reasonable under the totality of the circumstances, it is appropriate to take into account the knowledge that an officer in the searching officer's position would have possessed."  911 F.2d at 78.  Because the search of the LG smartphone was executed by Investigator Ebert—the same officer who had prepared the affidavit which contained probable cause and particularly described the information to be searched for— this eliminated the chance of the wrong information being seized.

In sum, none of the exceptions which would preclude a finding under the Leon good-faith exception are applicable here.  Therefore, Investigator Ebert's good-faith reliance on the warrant issued to search Defendant's LG smartphone militates against suppressing the evidence obtained during his search of the downloaded content of the phone for information of guns and drugs between October 22, 2020, and November 16, 2020.

Accordingly, to the extent Defendant's Motion to Suppress His Cell Phone Contents, [Docket No. 48], seeks an Order of this Court suppressing all evidence flowing from the execution

of the Cellphone Search Warrant, which authorized law enforcement to search the contents of his

LG smartphone, the undersigned recommends that Defendant's Motion to Suppress His Cell Phone

Contents, [Docket No. 48], be **DENIED**.

## V.    CONCLUSION

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED THAT**:

1.   Defendant's Motion to Sever Counts, [Docket No. 23], be **DENIED**;

2.   Defendant's Motion to Suppress Evidence, [Docket No. 26], be **DENIED**; and

3.   Defendant's Motion to Suppress the Defendant's Cell Phone Contents, [Docket No. 48], be **DENIED**.


Dated: September 9, 2022                                   s/Leo I. Brisbois
                                                          Hon. Leo I. Brisbois
                                                          U.S. Magistrate Judge

### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.